THE PEOPLE OF PUERTO RICO, Prosecutor and Appellee, *v.*
CATALINO REYES MORALES, Defendant and Appellant.

No. 16178.    Decided June 13, 1966.

*Guillermo S. Pierluisi* and *Walter Pierluisi* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Rodolfo Cruz Contreras, Assistant Solicitor General,* for The People.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

On November 28, 1955 an information against Catalino Reyes Morales was filed in the Superior Court, Arecibo Part, for the crime of murder in the first degree for having poisoned

his 2-year-old son. On February 24, 1956 the jury brought a verdict of guilty of murder in the first degree and on February 29, 1956 the judge who sat in the case, Rafael Padró Parés, sentenced defendant-appellant to life imprisonment. Until then defendant-appellant was represented by attorney Diego E. Ramos. On March 2, 1956, when he no longer had professional assistance, defendant-appellant filed a notice of appeal before this Court.

Since then until now the most dramatic effort has been made so that the right of Catalino Reyes Morales to appeal reaches its reasonable effectiveness. The first motion of defendant-appellant, dated June 4, 1956, requesting a 30-day extension for the stenographer of the Arecibo Part to prepare the transcript of evidence for the appeal filed, was denied by the trial judge on the ground that no petition requesting said transcript had been filed. On September 20, 1956 this Court ordered the dismissal of the appeal because of abandonment of action.

On October 31, 1958 defendant-appellant, represented in his renewed effort by Attorney Guillermo S. Pierluisi, requested this Court to reinstate the dismissed petition for appeal alleging then that "in view of the serious nature of the offense for which he was accused and convicted and because of his insolvency and poverty to protect his right to appeal, lacking legal counsel to take care of the incidental steps to perfect the appeal, it was the duty of the court, in the exercise of its supervisory powers, to see that the transcript of evidence be prepared, particularly, in view of the very special circumstance that appellant is in prison, prevented from taking the necessary steps in defense of his rights . . . that his petition is meritorious inasmuch as he is not guilty of the offense charged, that of having poisoned his own two-year-old child . . . that Dr. Roberto Vega's testimony, who testified at the trial, states that when the autopsy was performed on said minor, there were many

live worms in the abdomen and in his lungs, something for which he cannot account for considering what is alleged herein against appellant in the sense that he had poisoned his own son with an insecticide and fungicide which necessarily had to kill said worms . . . that regarding appellant's rights, he was deprived of the due process of law, as well as of the equal protection of the laws, in violation of Art. II, § 7 of the Constitution of the Commonwealth of Puerto Rico."

The petition having been referred to the Prosecuting Attorney of this Court, at that time Mr. William Fred Santiago, he stated the following: "We are aware of the fact that every litigation must come to an end because otherwise no judicial proceeding would be subject to prosecution, at the same time that the operation of the courts and the administration of justice are hindered, if time for litigations and judicial proceedings could not be delimited . . . . That we are also aware of the fact that the administration of justice must be done in the interest of man and society, predicaments of its raison d'etre. . . . That we are also aware of the fact that when a defendant appeals on his own right and without legal assistance and counsel, he does so at his own risk taking all the consequences which may stem from it. . . . That notwithstanding the foregoing and by virtue of the ruling of this Court in *People* v. *Santos,* 80 P.R.R. 591, 594 (1958) and in spite of the fact that in this case of Santos, because of a concession to the defendant, giving him the benefit of litigating in forma pauperis, which is not present in the case at bar, a situation which distinguishes them, it could be understood that the notice of appeal filed by defendant himself could be considered sufficient to comply with the requirement that an order for the transcript of evidence be requested. . . . (That) if it is understood that this request should be liberally interpreted, consonant with the doctrinal context of the *Santos* case, *supra,* in the use of the discretionary power, this Court could set

aside its order of September 20, 1956 and reinstate the appeal of defendant-petitioner herein. . . ."

In effect, on December 5, 1958, having considered defendant's petition and the report of the Prosecuting Attorney of this Court, at that time Mr. William Fred Santiago, we set aside our previous order of September 20, 1956 dismissing the appeal, reinstated the petition for appeal, requested the return of the mandate, and the trial judge was instructed to allow appellant a new term to request the transcript of evidence.

Of very little help to defendant-appellant was our instruction to the trial judge to grant a new term to request the transcript of evidence. With the lapse of time the administrative picture of the court had changed, the stenographer who took down the testimonies was no longer employed in the court and although at first he agreed to accept a reasonable sum offered to him by defendant's attorney from his own pocket to prepare said transcript, he afterwards asked for twice the amount for the same work. When he was summoned for contempt of court on April 13, 1961, he answered informing of his resignation as record stenographer, that he is working with the Federal Government in the War Department, Division of the National Guard, and alleging that he was under no obligation to comply with the showing of cause because he was not an employee of the judicial branch or of any other branch of the Government of Puerto Rico and because: "There is nothing in the text of the legal provision or in the other laws which regulates the court-stenographer profession to bind the latter to comply with an order for a transcript of evidence once he has resigned his office. . . . In our opinion, in case of resignation the stenographer is in the same position as when he is absent or disabled. In other words, the stenographer, as a court officer, is bound to render his services free of charge when a party

is allowed to litigate in forma pauperis. *Aybar* v. *Vara*, 48 P.R.R. 176 (1935). That obligation, nevertheless, ceases when he is no longer an officer of the court. . . . But there is more. Section 12 of Art. II of the Constitution of the Commonwealth of Puerto Rico provides that neither slavery nor involuntary servitude shall exist except in the latter case as a punishment for crime after the accused has been duly convicted . . . and by § 16 of the same Art. II of the Constitution, the right of every employee to choose his occupation freely and to resign therefrom is recognized, as is his right to equal pay for equal work, to a reasonable minimum salary. . . . In view of these constitutional basic rights we have necessarily to conclude that it could not have been the intention of the framers of our fundamental law, that some human beings for reason of having occupied a public office be forced to discharge certain tasks after they have ceased in their employment, by resignation duly accepted, and without receiving remuneration, while others are covered by the protective pall of those constitutional guarantees."

The defendant answered this motion in the following terms: "The stenographer now alleges for the first time, that at the time Judge Padró Parés entered the order for him to prepare the transcript of the evidence as his duty in this case, he was no longer the court's stenographer because he had resigned. Nevertheless, said stenographer remained silent at the beginning when he was first ordered to make the official transcript in the month of January 1959. On the contrary, said stenographer, aware of the situation, limited himself to accepting the court's order and to request extensions to prepare said transcript, which extensions delayed the proceedings in this case unnecessarily to the prejudice of the defendant. It is likewise alleged that said stenographer kept silent for over two years without refusing or objecting to prepare the transcript ordered by Judge Padró Parés in January 1959, having delayed and obstructed jus-

tice and the proceedings before this Court which constitutes contempt of court. It is alleged also that the stenographer is entitled in any case to collect his fees from the People of Puerto Rico, inasmuch as the court recognized the insolvency of the defendant and the latter is not bound to pay, and as said stenographer is the only person who can transcribe said notes, he is bound to transcribe them, either officially, for having acknowledged the order of the court without protest, or by charging the People of Puerto Rico. It is likewise alleged that it is not possible to make a statement of the case, inasmuch as the defendant is an ignorant, illiterate jíbaro and the subscribing attorney did not take part in the defense during the trial in the Superior Court of Arecibo, being unacquainted with the facts and the evidence submitted, the transcript of the stenographic notes being the only possible way to perfect the appeal. That the allegation made for the first time and after two years by stenographer Berríos refusing to transcribe the stenographic record in open disobedience of the court order is untimely, and that he is estopped to do so at this time because of his acts prejudicing the defendant seriously with his dilatory and malicious conduct which constitutes an open contempt of the authority of this court."

Stenographer Berríos won the battle. It was necessary to transfer the record to San Juan because the order for contempt was signed by a special judge. On June 21, 1961 the defendant-appellant, pressed by the orders of this Court where his appeal appeared in apparent state of abandonment, requested the Court, through his diligent attorney for the defense, Mr. Guillermo S. Pierluisi, to decide whether it should sustain the order given the stenographer to make the official transcript. On May 9, 1962 the incident was decided by the Court in the following terms: "We have examined the record and it shows that the order for the transcript of evidence in forma pauperis was entered by the court when

the stenographer Alfredo Berríos Pérez had already resigned as stenographer of this Part. Consequently, we deem that we should set aside, as we hereby do, our order entered on April 13, 1961. The stenographer is relieved from compliance with the order of transcript of evidence and inasmuch as this case is up for appeal before the Supreme Court, it is appropriate that the defendant-appellant prepare a statement of his case to sustain his appeal. Copy of this order should be served on the parties."

The statement of the case filed before this Court is taken from the sworn statements kept by the prosecuting attorney and reads thus:

"The trial against Catalino Reyes Morales, G-55-192, for Murder in the First Degree, was first held on February 15, 1956, until February 24 of that year, the defendant being duly represented by Mr. Diego. E. Ramos, as defense counsel and The People. by the subscribing prosecuting attorney. The court was presided by Judge Rafael Padró Parés.

CARMEN CANDELARIA MEDINA: The first witness for the People of Puerto Rico, Carmen Candelaria Medina, concubine of the defendant, who testified that during said concubinage the defendant behaved very well towards her, was always affectionate until some time prior to the charges made against him when he unjustifiedly became jealous of a certain man named Gustavo Llanes, who owned a farm adjacent to the piece of land where defendant's residence was located in the Viví Abajo Ward of Utuado, Puerto Rico.

Carmen Candelaria Medina also declared that during her concubinage with the defendant they had three children called Ada Irma Reyes, four years old; Aurelio Reyes, two years old, and Hortensia Reyes, ten months old, who lived together with and under the same roof of their parents. Carmen Candelaria Medina stated that they had squabbles and disagreements but that they again became reconciled when the defendant would go after her to continue living together; that the defendant toiled in agricultural work, almost always close to their residence and that she helped him in the agricultural work in addition to her household duties.

This witness continued to state that at twilight on September 4, 1955, after the defendant had expressed his jealousy, he asked the witness to put the children to bed early, that she obeyed him, then the defendant closed the doors of the house and beat her forty times with a guava-bush stick as thick as a quarter. That night they slept separately under the same roof, the next day September 5, 1955, at twilight, defendant Catalino Reyes Morales again asked her to put the children to bed early, that she saw him sharpening a machete with a file he had bought that day, that she obeyed him by putting the children to bed at the time he indicated before and that afraid that he would repeat the assault of the previous afternoon, she sneaked out and went for protection to her compadre Juan Cortés' home, where she spent the night of the 5th to the 6th of September 1955. This witness states that next morning, that is, on September 6, 1955, she went to the Utuado court to explain the reasons she had for leaving the defendant.

*Photographs*: Two photographs marked Exhibits 1-a and 1-b of the People of Puerto Rico were introduced and accepted as evidence by the court; in them the witness identified the mark and the prints of the blows she allegedly received at the hands of the defendant, at sundown on September 4, 1955.

CÁNDIDA MEDINA GONZÁLEZ: The second witness for The People of Puerto Rico was Cándida Medina González, over 21 years old, who stated that the defendant and Carmen Candelaria Medina had lived together for a short time prior to the morning of September 6, 1955, in a house nearby the one occupied by the witness and her family. That on that day, September 6, 1955, about seven in the morning, the defendant Catalino Reyes Morales went to beg the witness to take care of his three children because he alleged that his wife had left him the night before and that he was going into town to get somebody who could take care of his children.

This witness said that she refused, but that at the insistence of the defendant and in view of the fact that he looked nervous and as if crying, she agreed to take care of the three children. She stated that the defendant brought the children to her in two trips and that the last one he brought was the two-year-old boy Aurelio Reyes, and when he handed her some Denia milk, sugar and powdered coffee, the defendant told her that the boy cried

very much because he missed his mother. This witness continued testifying that as soon as he delivered his son Aurelio Reyes, after two or three minutes had hardly elapsed, almost immediately after the defendant turned his back to go into town the boy started to cry, became limp, showed the white of his eyes, looked restless, spittle ran out of his mouth; he refused food and the witness thought the boy was seriously ill and immediately, in less than ten minutes, she was on her way to the Utuado Municipal Hospital, where she took the boy Aurelio Reyes that same morning of September 6, 1955.

When the defendant delivered the boy to her, he said: 'That child is going to bother you a lot and he will keep crying until I get back because he will not stay with anybody.'

DR. ROBERTO VEGA: The third witness for the People of Puerto Rico was Dr. Roberto Vega. His capacity to testify was accepted and he stated that he performed the autopsy on the body of the two-year-old boy Aurelio Reyes. That he was brought to the Utuado Municipal Hospital but that he died almost immediately; that the boy Aurelio Reyes was having convulsions and throwing up a white liquid; that the boy did not respond to physical stimuli, that he had difficulty in breathing, had a rale, accumulation of secretions and dampness in the lungs, had abnormal respiratory noises. That he prescribed digitalis atropine and heart stimulants.

Dr. Roberto Vega testified that upon performing the autopsy he noticed that many worms had invaded different organs of the body of the deceased, that this situation may occur after the death of a human being because the worms that may be in the body try to get out after death has occurred. That he performed the autopsy upon instructions from Prosecuting Attorney Efraín Ruíz, and removed the gastric juice and the viscera from the deceased's body to have a toxicological test performed. The witness testified that the deceased was duly identified.

Dr. Roberto Vega testified that he had been unable to determine the cause of death because he did not want to run any risk before getting the result of the toxicological analysis of the deceased's viscera. That the symptoms he observed in the boy Aurelio Reyes were those that could be observed in a case of poisoning, such as the rale he had, the difficulty in breathing, the unresponsiveness to physical stimulus, the limpness, the weakened nervous system, the accumulation of secretions and

dampness in the lungs, and the increase in the heart beats.

He also testified that the deceased was normally healthy, his abdomen was not rigid, he did not have swellings in the abdomen as it happens when worms in a human being try to migrate. That the boy did not cough. That when there is obstruction in the lungs the air does not go in and in this case he noticed that there was air in the lungs.

*Stipulation*: Afterwards, and by means of stipulation between counsel for the defense and Prosecuting Attorney Efraín Ruíz, a stipulation in writing dated February 21, 1955 was submitted and approved by the court and it is part of the record of this case in the Secretary's office. In said stipulation it was provided that the evidence to which expert Santiago Carmona referred in his testimony was delivered to him in the following manner:

Dr. Roberto Vega removed the gastric juice, handed it to policeman Francisco Román Feliciano, badge number 1471, from Utuado, in a vessel identified by expert Santiago Carmona and handed it to Judge Marín Baéz, who in turn delivered it to detective Francisco López, together with the evidence examined by expert Santiago Carmona in the amber-colored bottle and in the pint bottle, as well as evidence consisting of sugar, ground coffee, half a can of powdered Denia milk, and a small bag containing Vapofos powder, López handing all this evidence to chemical assistant Angel Cordero, who in turn delivered it to expert Santiago Carmona.

It was further stipulated that defendant's nail clippings were obtained by policeman Francisco Román from defendant himself and delivered to Prosecuting Attorney Efraín Ruíz, who handed them to policeman Angel Rivera in two small separate envelopes and were delivered directly to assistant chemist Angel Cordero, who in turn handed them to expert Santiago Carmona in the same condition in which they were obtained, without any alteration.

Attorney Diego E. Ramos requested the court to designate a physician to advise him and Dr. J. Rodríguez Quiñones, of Arecibo, Puerto Rico, was designated.

RAFAEL SANTIAGO CARMONA: The fourth person to testify was expert chemist Rafael Santiago Carmona. In his testi-

mony he referred to four metal jars containing vials, which were marked as Exhibit 4 of The People. Two of the vials mentioned contained residuums of Vapofos. He identified two envelopes containing nail clippings from both hands of defendant Catalino Reyes Morales, and a paper bag containing specific powders. Everything was labeled as Exhibit 4 of The People, with letters A, B, C, and D.

After identifying a can without a lid of those used for Denia milk, the bottom of which contained a sand-colored residuum, expert Santiago Carmona testified that the result of the analysis of said evidence was that it contained parathion, which is a toxic and dangerous poison. He also identified and referred in his testimony to a bottle of milk which when analyzed, contained residuums of Vapofos. That the residuum weighed 3.4 grams (1.4% of Vapofos) and he accompanied and identified a vial containing the isolated residuum. He related this part of the testimony to an amber-colored bottle of the ones used for bottling Malta Corona, which he said contained approximately 250 cc. of a liquid which looked like milk with a slight yellow tinge.

Referring to the transparent pint bottle with a cork stopper which contained 255 cc. of a liquid resembling milk with a slight yellow tinge, which evidence was mentioned in the stipulation of February 21, 1956 and submitted in evidence, expert Santiago Carmona said that the result of the analysis was parathion in the residuum. That said residuum was isolated by extraction and centrifugal force, weighing approximately 13.8 grams (6.19% of Vapofos), accompanying and identifying this testimony with the pint bottle which he received according to the written stipulation submitted in evidence and which has been referred to.

Expert Santiago Carmona continued to testify regarding the evidence submitted by stipulation with respect to the nail clippings of the defendant, which he received for examination in two separate envelopes, that Catalino Reyes Morales' right hand fingernails gave a positive reaction of parathion and those of the left hand a slight positive reaction of parathion. Said expert testified that Vapofos is a commercial product containing 15% parathion, an organic compound synthesized by Dr. Schrader and of exclusive application as insecticide and fungicide. That death can occur within a term of from half an hour

to four hours and sometimes it occurs within ten minutes after having ingested it. That 15 mg. constitute a toxic dose. Biologically, it produces the following symptoms: pin-head shaped pupils, loss of perception of depth, headache, diarrhea, pain in the chest, bronchial spasms, vomiting, salivation, convulsions, loss of reflexes, loss of breathing, and death.

DR. BENITO IRIZARRY: The testimony of Dr. Irizarry followed and he explained the biological symptoms produced by Vapofos in a human being and answered hypothetical questions. Referring to the testimonies of Dr. Roberto Vega and expert Santiago Carmona, he stated that in the case of Aurelio Reyes, the deceased in this case, a pulmonary edema must have occurred and the death of said human being. That his death could not have been produced by any other cause but by poisoning with Vapofos.

Dr. Irizarry testified that he has had experience with cases of breathing obstruction due to worms in which the patient dies in a couple of hours. That no pulmonary edema is produced and that in that case the lung does not receive air, does not expand.

JUAN COLLAZO NEGRÓN: Juan Cortés Negrón testified that on Monday, September 5, 1955, after 1:00 p.m., defendant Catalino Reyes Morales bought from him a handleless file for which he paid him fifteen cents. That the distance between his store and Catalino Reyes Morales' home was not less than one fourth of a kilometer. The name of this witness is Juan Collazo Negrón and not Juan Cortés Negrón.

POLICEMAN FRANCISCO ROMÁN FELICANO: Francisco Román Feliciano, a policeman, testified. He indicated that he investigated the facts in this case and that in the morning of September 6, 1955, defendant Catalino Reyes Morales visited the police station of Utuado to report that his wife, Carmen Candelaria Medina, had poisoned their kids with some milk prepared with poison for tobacco. That he had caught her with the poisoned milk and had thrown it away. That it happened on two occasions. That on instructions of Judge Jorge Marín Báez, he went with Catalino to look for Carmen.

This witness testified that Catalino said that Carmen had fed the poison to the children in the milk and that the previous Sunday, September 4, 1955, he had surprised Carmen with some poison prepared in one of the cans used for Denia milk, from

which she was going to feed the poison to the children, and that on account of all this Catalino declared that he had given Carmen a beating and Catalino had told Carmen that he was not going to denounce her to the police because he thought that the beating he had given her was enough. The witness testified that the statements made by Catalino referred to occurrences on Sunday, September 4, 1955. That that night everything had been quiet and they had had lunch and breakfast as usual the following day. That on the next day, Monday, Catalino had gone to work.

Said witness testified that Carmen had told him that Catalino was jealous of Gustavo Llanez and that that was why he beat her. That on Monday, September 5, 1955, the defendant exchanged some words with Gustavo Llanez because of jealousy. That Catalino said that he was going to buy a file to sharpen the cutlass because what she was going to get was going to be more than what she got the night before, and that she left the house on Monday, shortly after 6:00 p.m. because she was afraid he would cut her. This witness testified that Catalino Reyes, the defendant, had told him that his concubine, Carmen Candelaria Medina, had left him on the afternoon of September 5, 1955, alone with the kids, that is, with his children. That on Tuesday morning he had left the children in care of a neighbor while he went into town.

JUAN CORTÉS: The last witness to testify was Juan Cortés, who stated that on Monday, September 5, 1955, at sunset, his godchild Carmen Candelaria Medina arrived at his home and spent the night there from September 5 to 6 of 1955, his house being far away, more than one or two kilometers from the house where she and Catalino Reyes Morales lived.

*Sworn Statements of the Defendant*: Lastly, two sworn statements signed by the defendant, Catalino Reyes Morales, were introduced and accepted in evidence by the court; one dated September 8, 1955 which consists of two sheets written on both sides, and the other, dated September 21, 1955, consists of one page written on both sides. Said statements appear in the record of this case as Exhibits 5A and 5B of The People.

*First Statement*: In his first statement, dated September 8, 1955, defendant Catalino Reyes Morales testified substantially that for the last seven months he had lived with Carmen Cande-

laria Medina and their three children, among whom he mentioned the deceased Aurelio Reyes, who was to be two years old. He said that he had disagreements with his concubine, but that there were no arguments between them while they lived in Julio Villafañe's farm. That he was never jealous of his wife, that she was pleasant and affectionate.

That on Sunday, September 4, 1955, they were both very happy and gay and she helped him with a seedbed. That the following day he had breakfast and lunch as usual. He accepted having sharpened a cutlass on Monday afternoon. That on Sunday, September 4, 1955, between 6 and 7:00 p.m., he and his wife had an argument. That he had given his wife a beating with a stick from a guava tree. That she didn't do anything to defend herself from the blows. That he had beaten his wife because he perceived a strong smell of poison and had seen milk fixed with poison, stating that he had not seen her trying to poison their children or that she was going to feed that milk to the children. That on the following day, Monday 5, both he and the children had a quiet lunch and dinner. That he was not afraid about her poisoning him and the children the next day.

The defendant testified that on Monday, September 5, 1955, his concubine, Carmen Candelaria Medina, left him about 7:00 p.m. That at daybreak the morning after his concubine had left him, he went to a neighbor's house to ask her to take care of the children while he went to town. That his boy, referring to Aurelio Reyes, was in good health, was not complaining at all, was gay and happy. That during the night of September 5 to 6, 1955, he had left a can of poisoned Denia milk on the floor, but that next day when he was going to take it to the police, the container was in the same place and had the same amount it did when he left it on the floor of his home.

*Second Statement*: Referring to the sworn statement of defendant Catalino Reyes Morales dated September 21, 1955, he freely and voluntarily stated that he had left Tuesday morning, September 6, 1955 for the police station with milk in a bottle and a small can of Denia milk. That his son Aurelio Reyes had given up the bottle and was drinking from cups. That the Sunday before he had beaten his concubine forty blows with a stick. That the preceding Sunday, at the time of the occurrence, there was a bagful of poison resting on a shelf. That he was not

cautious enough to throw the small bagful of poison into the latrine on Sunday.

That when he took the bag he was very careful in holding it by a corner with the index and thumb of his right hand. That he never put his hands inside the bag. That he saw the bag with the poison again the following Monday about 6:30 p.m. on top of the stove. That the bottle and the can of milk which he alleges having seen Monday afternoon were left by him in a corner on the floor of the house.

The defendant declared in his sworn statement that he knew that the poison he referred to in his testimony was dangerous. The defendant also stated that during the last months and up to the date on which the facts occurred he had not been handling that kind of poison. He accepted also that he had voluntarily consented to have the fingernails of his right and left hands trimmed, to be examined in the laboratory, consenting to have them examined for any poisonous substance."

As we can see, the statement of the case filed in this Court, because it consists of the testimonies which appear in the record of the Prosecuting Attorney of the Arecibo Part, Mr. Efraín Ruíz Laabes, does not contain the objections of the defense to the documentary or objective evidence nor to the oral examination of the witnesses for the prosecution, the cross-examination of those witnesses by the defense, or the instructions to the jury by the judge who sat on the case, Mr. Rafael Padró Parés.

In his brief, counsel for the defendant-appellant assigns the following errors: (1) In view of the circumstances of the statements of the case, defendant is deprived of the due process of law when he is unable, in the exercise of his right of appeal, to benefit from a review by this Court of the instructions given to the jury by the trial judge. (2) Error of law was committed when photographs of blows allegedly caused by the defendant on his concubine Carmen Candelaria Medina were admitted, since said blows had no direct relation with the case in itself and served to impress the jury unfavorably against the defendant. (3) Because the evidence

in this case is strictly circumstantial, confusing, which does not exclude the possibility of minor Aurelio Reyes having died as a result of the worms found in his body or by poisoning administered by his own mother, Carmen Candelaria Medina.

1. When on February 10, 1964, and by virtue of a stipulation signed by the Prosecuting Attorney of the Superior Court of Puerto Rico, Arecibo Part, Mr. Efraín Ruíz Laabes, and by defendant-appellant's attorney Guillermo S. Pierluisi, the statement of the case was filed in this Court, Rule No. 208 of the Rules of Criminal Procedure of 1963 was effective in Puerto Rico, providing: "In the event no stenographic report of the evidence or of the proceeding at a hearing or trial was made or if for any reason such report can not be transcribed, the appellant may prepare a summary of the evidence or of the proceedings, using for such purpose the best available means, including his recollection, to be used instead of a stenographic transcript. This summary shall be served on the prosecuting attorney, who shall present his objections or propose amendments within ten days after service upon him. Immediately thereafter, said summary, together with the objections or proposed amendments, shall be submitted to the Superior Court for settlement and approval and, as settled and approved, shall be included by the clerk of the court in the record on appeal."

■■ It is undoubtful that the purport of Rule 208 previously cited is not a simple recital of the prosecuting attorney's investigation, in the statement of the case. The statement of the case, regarding its content, must be somewhat similar to the transcript of the hearing, to the impanelling of the jury, its qualification and final approval, with its offers of evidence, the objections to admission thereof, the rulings of the presiding judge, either admitting or refusing the evidence offered, the instructions to the jury. In this case

the statement contains everything that can be prejudicial and nothing that can be of benefit to defendant. It is just like convicting a man solely on the evidence that could have been accumulated against him. Counsel for defendant-appellant stresses the complete lack of instructions to the jury. On his part, the prosecuting attorney seems inclined to affirm that the instructions are not an intrinsic part of the judgment roll. The most we have said so far is that: "Appellant's allegation to the effect that the fact that the presiding judge failed to sum up the evidence was prejudicial to him, is answered by the statement of counsel for the defense which appears in the record to the effect that he agrees that no such summary be made." *People* v. *Rivera*, 83 P.R.R. 452, 466 (Dávila) (1961). In that same case right below attention is called to our ruling in a previous case: *People* v. *Millán*, 71 P.R.R. 410, 414, 415 (Negrón Fernández) (1950):

"As the record before us shows, the judge of the lower court, at the outset of his instructions to the jury, stated: 'The parties stipulated that no analysis of the evidence be made.' Although the record does not show any stipulation to that effect, we are not in a position to decide that it was not so agreed by the parties, the more so when the record is silent as to whether or not the defendant through his lawyer objected to the statements of the court or took any exception to the instructions to the jury. It is now on appeal, that he contends for the first time, that there was no such stipulation. In *People* v. *Valentín*, 63 P.R.R. 756, 762, we stated:    'It is true that the court is bound to make a summary of the evidence, as has been decided in the cases of *People* v. *Cartagena*, 54 P.R.R. 827, and *People* v. *Lebrón*, 61 P.R.R. 634; but when the court, due to inadvertence or any other reason, does not make such a summary, it is incumbent on the accused to ask that the court do so. If the accused, as happened in the present case, waives that right when expressly stating that he has no objection to the instruction, he has no reason to complain. Moreover, we are not convinced that the accused has suffered any prejudice.'

"We are satisfied, under the circumstances of this case that as stated by the lower judge, the defendant waived the summing up of the evidence and that therefore he has no reason to complain. However, we must repeat here once more what we stated in *People* v. *Lebrón*, 61 P.R.R. 634, 647, and ratified in *People* v. *Rodríguez*, 69 P.R.R. 913, 920, that gives full expression to the procedure which district judges invariably should follow in trials by jury, according to subdivision 8 of § 233 of the Code of Criminal Procedure:

'The practice of the judge omitting to sum up the case to the jury is not only contrary to the express provisions of the law, but is also prejudicial to the ends of justice. The reason why the evidence should be summed up, as the transcribed section states, is that the essential facts adduced by both parties should be pointed out to the jury. In other words, to sift the evidence, thus preventing the jury from being led into error or confusion by taking into consideration facts immaterial to the decision of the case. What is more, in his instructions the judge ought not to read the bare letter of the law. The jury is comprised of persons not learned in the law, and to read to them the law in this way is the equivalent of placing in their hands the statute in order that they may decide the case in accordance with the interpretation which they may deem most fitting. For that reason the better practice is, after summing up, to give the jury the different conclusions at which, in weighing the evidence, they may arrive, and to indicate to them the verdict that should be given in relation to each one of those conclusions. In that way the duties of the jury are circumscribed to their true limits, that is, the determination of questions of fact, and the situation is thereby avoided of the jury being in agreement as to the facts and erring in applying the law.' "

A murder in the first degree, as a consequence of the different mental elements and rules of intention which come into play in the reduction of the degree, always requires a judicial refinement, in order to comply with the duty of giving the jury the most thorough instructions. At the time of summing up the evidence, there are certain facts, some passionate attitudes, flashes of violence which should be emphasized by the law expert so that the jury may understand

better the modality of the crime which corresponds to each factual situation. The reconstruction of said instructions by the presiding judge would have been impossible because when the stipulation was signed by the parties, the judge was not part of the Superior Court of Puerto Rico, and any reconstruction by him would have been objectionable.

■ 2–3. Albeit we have to admit that there is evidence with respect to the death of a child, presumably by poisoning, the motive, the purpose of the will, the intention must be established by virtue of a simple deduction of the facts. In this case, the possibility of carelessness would carry as much weight as that of the intentional act. This being so, and in furtherance of justice, a new trial should be had in which, besides clearing up the facts, we could have a clearer expert picture of the cause of death.

The judgment entered by the Superior Court, Arecibo Part, on February 29, 1956 will be reversed.

Mr. Justice Pérez Pimentel concurs in the result in a separate opinion in which Mr. Justice Dávila joins. Mr. Justice Blanco Lugo concurs in the result in a separate opinion in which Mr. Justice Ramírez Bages joins. Mr. Justice Santana Becerra did not participate.

—O—

Separate vote of MR. JUSTICE PÉREZ PIMENTEL, with whom MR. JUSTICE DÁVILA concurs.

San Juan, Puerto Rico, June 13, 1966

An examination of the record shows that the incidents following the filing of this appeal, among them, the form of preparing the statement of the case, using as its only source the prosecuting attorney's information, the impossibility of transcribing the instructions charged by the judge, as well as the evidence introduced for this and other proceedings in the trial, have deprived defendant of fully exer-

cising his right to appeal, for which reason it is appropriate, in furtherance of justice, to reverse the judgment appealed from and to order that a new trial be held.

—O—

MR. JUSTICE BLANCO LUGO, with whom MR. JUSTICE RAMÍREZ BAGES concurs, concurring.

San Juan, Puerto Rico, June 13, 1966

An examination of the record shows that in his efforts to perfect the appeal and faced with the impossibility of preparing a transcript of the stenographic record because of resignation of the stenographer who took it at the trial, the appellant himself chose the statement of facts of the case.[1] To that effect, Mr. Guillermo Pierluisi contacted Mr. Diego Ramos, who had been the counsel for the defense in the trial court, but the latter could not help him because he did not remember a thing either about the incidents or evidence introduced at the trial. Faced with that new difficulty, he suggested to the prosecuting attorney to prepare the statement of facts with what he remembered of the evidence and with the statements in the record of the investigation, in order to request the court *by stipulation* to approve it for the purposes of the prosecution of the action.[2]

---

[1] See Rule 208 of the Rules of Civil Procedure of 1963, and its predecessors § 356 of the Code of Criminal Procedure, 1935 ed., 34 L.P.R.A. § 1081, and § 356 of the Code of Criminal Procedure of 1902, pp. 702–703 (Rev. ed. 1902), in relation to §§ 294–300 of this former Code, pp. 688–690 (Rev. ed. 1902).

[2] From Mr. Pierluisi's letter to Prosecuting Attorney Efraín Ruíz, we copy:

"In relation to our conference regarding the case pending before the Hon. Supreme Court of Puerto Rico, I would appreciate your informing me whether you prepared the statement of facts you promised me, inasmuch as you are the only person who can do it from the testimony of the witnesses in court contained in the record.

"As I informed you, colleague Diego Ramos, who was the defense counsel before that court, does not remember anything concerning the facts; I could hardly think of perfecting the appeal without your help. As

This was done. Actually, on December 3, 1963, *without any objection whatever*, the statement of the case was submitted and approved by order of this Court, dated May 20, 1964.

That being the situation we cannot see how the failure to state or summarize the instructions delivered to the jury can now be assigned as reversible error. It was appellant's obligation, if he was interested, to see that anything relating to the instructions went into the statement of the case, see *People* v. *Lafont*, 54 P.R.R. 351 (1939), but he failed to do so probably aware of the provisions of Rule 10(g) of our Rules.[3] He chose to remain silent. If there is a case to which the presumption of regularity of the proceedings should be applied it is this one. *Cf. People* v. *Díaz*, 5 P.R.R. 415 (1904); *People* v. *Lugo*, 16 P.R.R. 236 (1910). Furthermore, this actually does not have the importance they seek to attach to it. The reduction of the degree of the crime is not in play. In view of a death allegedly caused by poisoning, there were only two possible verdicts, murder in the first degree or acquittal. It is significant also that no defense evidence was introduced and that "the possibility of carelessness" insinuated had to find support in the only evidence

I indicated to you, I am willing to accept the statement of facts you prepare, for I have the most complete confidence in your professional integrity and honesty. I pray you then, if you have not prepared said statement, to prepare and file it in court by stipulation from both of us, so that it be approved and sent up. If you wish send it to me and I shall prepare the stipulation and I will remit it to you for your signature. The Hon. Supreme Court granted me 60 days to prepare it, which term expires on November 13 of this year."

[3] "Where in a criminal case application is made to this Court to add to the record the instructions given to the jury in the Superior Court, such application shall be refused unless it be shown that the failure to include such instructions is due to the fault or neglect of the clerk of the Superior Court, or unless the appellant can show some effort on his part made before the transmission of the record to this Court to have the instructions reduced to writing and signed by the judge, and that such application has been refused for improper reasons."

introduced, that of The People, which included two sworn statements of appellant.

To summarize, the supposed prejudices assigned are more apparent than real. Fortunately, Rule 12.2 of the Rules of Administration for the Court of First Instance, adopted last May 3, will prevent in great measure the repetition of a state of facts like the one presented herein.

However, as we have said, within the evidence admitted and considered by the jury, there are two statements given by Catalino Reyes during the investigation, when he was already pointed at as possible defendant. Even though in said statements the commission of the crime is not expressly admitted, they hold sufficient incriminatory elements which, together with the rest of the oral evidence, complete the chain of facts which singled him out as guilty beyond any reasonable doubt. As this is a case which depended exclusively on circumstantial evidence, its exclusion was requested under the rule of *Rivera Escuté* v. *Delgado, Warden*, 92 P.R.R. 746 (1965), inasmuch as they were obtained without the warning of his right to legal counsel. On that ground alone I would reverse the judgment and order a new trial.

I am authorized to state that Mr. Justice Ramírez Bages concurs with this opinion.